BRE

1  JAMES A. DEMARAIS, ESQ. (SBN: 201500)
   A Professional Law Corporation
2  1835 W. Orangewood Ave., Suite 102
   Orange, California 92868
3  Telephone: (714) 241-7135
   Facsimile: (714) 241-8937
4

5  Attorney for Plaintiff, **WILLIAM C. HYSER**

3:11-CV-185
Jordan/Shirley

## UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF TENNESSEE AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., WILLIAM C. HYSER, an individual,<br><br>Plaintiff,<br>v.<br><br>EOD TECHNOLOGY, INC., a corporation, and DOES 1 THROUGH 75, INCLUSIVE,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR:**<br><br>1. **VIOLATION OF FEDERAL FALSE CLAIMS ACT (31 U.S.C. §§3729-3733)**<br><br>2. **EMPLOYMENT RETALIATION PURSUANT TO 31 U.S.C. §3730**<br><br>3. **WRONGFUL & TORTIOUS DISCHARGE IN VIOLATION OF PUBLIC POLICY**<br><br>4. **WRONGFUL & TORTIOUS DISCHARGE IN VIOLATION OF TENNESSEE CODE §50-1-304**<br><br>5. **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING** |

Plaintiff WILLIAM C. HYSER complains and alleges as follows.

### I. PARTIES

1. Plaintiff WILLIAM C. HYSER is a resident of Orange County, California.

2. Defendant EODT, INC. ("EODT") is a corporation with its headquarters

- 1 -
COMPLAINT OF WILLIAM C. HYSER FOR WRONGFUL TERMINATION

in Loudon County, Tennessee.

3.  Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-75, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when they have been ascertained.

4.  Plaintiff is informed, believes, and based on such information and belief alleges that each defendant sued herein as DOES 1-75, inclusive, was acting as the agent or employee of each of the other defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency and/or employment, and/or aided, abetted, cooperated with, and/ or conspired with one another to do the acts alleged herein.

## II. JURISDICTION

5.  This court has jurisdiction of this case pursuant to the federal False Claims Act (31 U.S.C. §3729-3733) ("FCA") and 28 U.S.C. §1331. This Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. §1367(a).

6.  Venue is proper pursuant to 28 U.S.C. §1391(c) because defendant is a corporation residing in this judicial district at the time this action is commenced.

## III. FIRST CAUSE OF ACTION

**(Violation of False Claims Act (31 U.S.C. §3729-3733))**

7.  Plaintiff re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 6 of this Complaint as if set forth here in full.

8.  The federal False Claims Act (FCA) (31 U.S.C. §3729-3733) provides that anyone who knowingly induces the United States to pay a false claim is liable to the United States. (31 U.S.C. §3729(a).)

9.  Liability for false claims under the FCA are specifically addressed under 31 U.S.C. § 3729, which provides, in relevant part, the following:

> (a) Liability for certain acts.
>     (1) In general. Subject to paragraph (2), any person who--

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);
(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;
(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

*****

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(31 U.S.C. § 3729(a).)

10. For purposes of 31 U.S.C. § 3729, the FCA states, in relevant, part that:

Definitions. For purposes of this section--
(1) the terms "knowing" and "knowingly"--
(A) mean that a person, with respect to information--
(i) has actual knowledge of the information;
(ii) acts in deliberate ignorance of the truth or falsity of the information; or
(iii) acts in reckless disregard of the truth or falsity of the information; and
(B) require no proof of specific intent to defraud...

(31 U.S.C. § 3729(b).)

11. Plaintiff is informed, believes, and based thereon alleges that Defendants have knowingly violated the FCA and conspired to violate the FCA in the following ways.

12. Plaintiff began employment with EODT on September 30, 2010 as an Assistant

- 3 -

| | |
|---|---|
| 1 | Team Leader providing personal security detail in Iraq to protect General Officers from |
| 2 | assassination, kidnapping, injury, or embarrassment pursuant to an employment contract. |
| 3 | Plaintiff began his mission with EODT in Iraq on October 05, 2010. |
| 4 | 13. Plaintiff is informed, believes, and based thereon alleges that AL HUREA is a |
| 5 | subsidiary or sister company of Defendant EODT that is the employment company or division |
| 6 | of EODT that hires local Iraqi Nationals so that EODT can secure private security contracts in |
| 7 | Iraq with the US Government. |
| 8 | 14. Plaintiff is informed, believes, and based thereon alleges that EODT and AL |
| 9 | HUREA shared the same offices in Iraq until recently when EODT physically moved its |
| 10 | offices to appear as a company separate from AL HUERA. |
| 11 | 15. Plaintiff is informed, believes, and based thereon alleges that KBR is a |
| 12 | subsidiary or sister company of Haliburton that the US Government has awarded certain |
| 13 | contracts to in Iraq to operate US fuel stations that must be operated by local Iraqi Nationals |
| 14 | employed by KBR as a condition of their contracts. |
| 15 | 16. Plaintiff is informed, believes, and based thereon alleges that the US |
| 16 | Government entered into certain contracts with EODT whereby EODT would provide private |
| 17 | security services on particular missions in Iraq and Afghanistan (the "Contract(s)"). |
| 18 | 17. Plaintiff is informed, believes, and based thereon alleges that under the |
| 19 | Contracts, the US Government would pay for fuel for a certain number of vehicles that were |
| 20 | authorized and designated to be used under each particular Contract with EODT for each |
| 21 | particular mission. |
| 22 | 18. Plaintiff is informed, believes, and based thereon alleges that pursuant to the |
| 23 | Contracts, EODT had to apply to the Department of State and/or Department of Defense, |
| 24 | depending on the particular mission, for fuel permits to obtain free gas at the US fuel stations |
| 25 | in Iraq run by local Nationals employed by KBR. |
| 26 | 19. Plaintiff is informed, believes, and based thereon alleges that in applying for |
| 27 | fuel permits, EODT is required to submit their application to KBR, who monitors the |
| 28 | application process, and KBR then, in turn, submits EODT's application to the Department of |

- 4 -

1 State and/or Department of Defense for final approval.

20. On October 23, 2010, EODT moved Plaintiff from the American Embassy in Iraq to a duplex owned, operated, and/or leased by AL HUREA as temporary housing for EODT employees.

21. Shortly thereafter, Plaintiff discovered that EODT and AL HUREA were knowingly and fraudulently adding additional, unauthorized personnel and equipment under existing Contracts with the US Government that EODT was billing and receiving money from the US Government.

22. Plaintiff is informed, believes, and based thereon alleges that, in the ordinary course of business, EODT employees such as Plaintiff would follow proper protocol by submitting applications to KBR for fuel permits to obtain fuel for EODT vehicles that were already approved under existing Contracts for specific missions.

23. Plaintiff is informed, believes, and based thereon alleges that, often times, certain Contracts would authorize a higher number of vehicles to receive fuel permits than an EODT employee following proper protocol was applying for in the application.

24. Plaintiff is informed, believes, and based thereon alleges that Iraqi Nationals employed by KBR to operate the fuel stations had possession of each Contract under which EODT employees were legitimately submitting applications and, thus, knew the exact maximum number of fuel permits that could be obtained under each Contract.

25. Plaintiff is informed, believes, and based thereon alleges that certain Iraqi Nationals employed by KBR would, therefore, identify this as an opportunity to obtain fraudulently additional fuel permits by adding additional vehicle identification numbers ("VIN") to the application after the fact without the knowledge of the EODT employee who submit the original application.

26. Plaintiff is informed, believes, and based thereon alleges that when the opportunity presented itself, Iraqi Nationals employed by KBR would notify certain EODT and AL HUREA employees of just how many more vehicles could be added to the application to obtain as many additional fuel permits as was allowed under each particular Contract.

27. Plaintiff is informed, believes, and based thereon alleges that certain EODT and AL HUREA employees including, without limitation, a woman named Helen, who is a Supervisor / Office Manager ("HELEN") in charge of many of the employees engaged in the misconduct, would then gather additional VINs of vehicles not owned by EODT and/or that were not being used for service under the particular Contract for which the fuel permits were being requested and would add them to each application, after the fact, and without the knowledge of the employee who originally and legitimately submitted the application; whereas, each vehicle is issued a separate fuel permit card.

28. HELEN or one of the other employees involved in the misconduct would then physically pick up the fuel permit cards from KBR to conceal their misconduct from the non-participating EODT employee and would give the fuel cards that were legitimately applied for to the EODT employees operating those vehicles and would give the fuel cards for the other vehicles that were fraudulently obtained to their cohorts and superiors at EODT and AL HUREA.

29. Plaintiff is informed, believes, and based thereon alleges that the vehicles that were fraudulently added to EODT's fuel permit applications after the fact were not actually used for the specific purpose and scope of work designated in each Contract under which the permit was obtained and/or the vehicles were not registered and/or owned by EODT.

30. Plaintiff is informed, believes, and based thereon alleges that EODT and AL HUREA have violated the FCA by engaging in a pattern and practice of knowingly and fraudulently obtaining EODT fuel cards to obtain fuel at US fuel stations for use in an H2 Hummer, BMW Sedan, and Chrysler (300) that are personal vehicles owned by Mr. Imod Abdel Karim Arkawazi, who is an owner of AL HUREA, as well as for use in four (4) F350 gun trucks and four (4) Mitsubishi pick-up trucks that are owned and/or registered to AL HUREA.

31. Plaintiff is informed, believes, and based thereon alleges that the foregoing vehicles, EODT vehicles, and other vehicles not owned and/or registered to EODT were also used to fill up at local KBR fuel stations using the fraudulently procured fuel cards to transport

- 6 -

fuel to different locations so that the fuel from the tanks could then be siphoned for sale and/or use in other unauthorized vehicles in which VINs were never submitted and/or identified and/or to fuel the Generator on the AL HUREA complex that is used to produce electricity for the AL HUREA complex and electricity that is being sold at a rate of $1,000.00 per month to the TOIFOR complex adjacent to the AL HUREA complex.

32. On November 27, 2010, while checking on the fuel cards for EODT mission vehicles, Plaintiff saw four (4) AL HUREA gun trucks operating with Iraqi private security permits displayed on the doors of each vehicle obtain fuel from a KBR fuel station using EODT fuel cards. The Iraqi private security permits displayed on the exterior of each of the vehicle doors revealed a "59", representing AL HUREA's private security company, not "22" which represents EODT as a separate and distinct private security company.

33. Plaintiff then saw the fuel being siphoned from the fuel tanks of the four (4) AL HUREA gun trucks and took a photograph of the AL HUREA employee(s) that were siphoning the fuel.

34. Therefore, on that same day on November 27, 2010, Plaintiff contacted Mr. Mark Wilson, at the American Embassy in Iraq, who verifies that Contracts with EODT are, in fact, Department of State Contracts for which fuel cards may be obtained.

35. Plaintiff was advised by Mr. Wilson that he was not the point of contact to report such a violation but that he would find out who Plaintiff could report the misconduct to and that he would then contact Plaintiff.

36. At this same time, Plaintiff also reported the misconduct to his superiors, following the chain of command, consisting of Mr. Jason Parrish (Team Leader) who sent it to Mr. Guy Irwin (Contract Project Manager) who sent it to Mr. Chris Meyer (Country Security Manager) and then on to Mr. Paul Lane (EODT Country Manager). In reverse action, starting with Mr. Paul Lane, strict orders and instructions were passed down the same chain of command to forget about what they had discovered and to move on.

37. On November 30, 2010, Plaintiff re-contacted Mr. Wilson at the Department of State regarding the fuel theft and other misconduct, and Mr. Wilson referred Plaintiff to Mr.

Cook with Inspector General's Office.

38. Plaintiff met with Mr. Cook mid-afternoon on November 30, 2010 along with another investigator from Mr. Cook's office at which time Plaintiff explained the misconduct that he had discovered and gave them all of evidence that he had at that time. Plaintiff was then specifically requested by Mr. Cook and the other investigator to obtain VINs to assist them in tracking the fuel records for the vehicles in question, which Plaintiff did.

39. Plaintiff is informed, believes, and based thereon alleges that shortly thereafter on December 08, 2010, EODT's headquarters in the State of Tennessee were raided by multiple Federal Agencies.

40. In late December, Plaintiff contacted a woman named Dawn who Plaintiff believed to be an agent with the FBI's local field office. Plaintiff discovered that she was not, but she referred Plaintiff to Mr. Greg Nester, who is a field agent with the FBI's field office in San Francisco, California who was temporarily stationed in Iraq.

41. Over the following four weeks, Plaintiff spoke to Mr. Nester in Iraq and finally met with Mr. Nester along with Ms. Brandee N. Kemer, with the Department of Defense Criminal Investigation Service, at the American Embassy in the middle of January 2011 to further discuss the fuel theft and misconduct of EODT and AL HUREA.

42. Plaintiff is informed, believes, and based thereon further alleges that EODT was purchasing weapons such as 9 mm firearms in the United States and shipping them to EODT in Iraq and other countries.

43. Plaintiff is informed, believes, and based thereon alleges that, on several occasions, EODT and AL HUREA tried to obtain fraudulently a fuel card for a 1000 liter fuel truck by adding it under certain EODT Contracts after Plaintiff had legitimately applied for fuel permits under particular Contracts.

44. Plaintiff is informed, believes, and based thereon alleges that EODT and AL HUREA were trying to slip the fuel truck under an existing Contract so that they could supply free fuel to their generator that provides power to: (1) villas where EODT employees are temporarily housed; (2) AL HUREA business offices and living quarters for AL HUREA

employees; (3) sell to TOIFOR, which is the company adjacent to AL HUREA.

45. Plaintiff is informed, believes, and based thereon alleges that pursuant to certain Contracts, EODT is authorized to employ a certain number of personnel to work only under a particular Contract for a particular mission.

46. Plaintiff is informed, believes, and based thereon alleges that each US citizen working for EODT under a Contract with the US Government must be issued a Department of Defense ("DOD") common access card ("CAC") first before being deployed to Iraq and/or Afghanistan on any mission.

47. Plaintiff is informed, believes, and based thereon alleges that before the US Government will issue a CAC, EODT must obtain a letter of authorization ("LOA") from the US Government.

48. Plaintiff is informed, believes, and based thereon alleges that for each Contract, EODT must enter all private information of each EODT employee who will be assigned to work under each particular Contract into the Synchronized Pre-deployment and Operational Tracker ("SPOT") (i.e., web-based computer system used to process, maintain, and track EODT employee information upon which LOA's are issued) and the US Government then, in turn, accesses the private information from SPOT, processes it for security clearance, and issues a LOA for each particular employee assigned to each particular Contract.

49. Plaintiff is informed, believes, and based thereon alleges that each employee then takes the LOA that was issued to him or her by the US Government to a military base where the LOA and the EODT employee's personal information is further processed and a CAC card is issued to that particular employee.

50. Plaintiff is informed, believes, and based thereon alleges that, in order to be issued a CAC, the employee must be a US Citizen because a CAC contains identifying information as well as a photograph of the person it is issued to that allows the CAC holder unfettered access and clearance to all US Military Bases as well as to all privileges thereon.

51. Plaintiff is informed, believes, and based thereon alleges that EODT has violated national security and the FCA by knowingly and fraudulently adding Iraqi Nationals

- 9 -

as employees of EODT under certain Contracts to obtain CACs and other badges for those Iraqi Nationals who are not actually working under the Contracts for which they were issued a CAC.

52. In or about January 2011, at Plaintiff's meeting with Mr. Greg Nester, FBI Field Agent, and Ms. Brandee N. Kemer, with the Department of Defense Criminal Investigation Service, Plaintiff also informed them that EODT was knowingly and fraudulently adding additional unauthorized personnel as well as equipment to Contracts that EODT was billing and receiving money from the US Government.

53. Plaintiff is informed, believes, and based thereon alleges that the information that Plaintiff provided to Mr. Nester and Ms. Kemer triggered Mr. Nester to further investigate the matter by interviewing Warrant Officer Perez, who is an attorney for the US Army and Army Contracting Officer RE ("ACORE") at the Forward Operating Base ("FOB") Shield overseeing the performance of Contracts between the US Military and EODT.

54. Plaintiff is informed, believes, and based thereon alleges that the information that Plaintiff disclosed to Mr. Nestor regarding EODT adding extra unauthorized personnel consisting of Iraqi Nationals to Contracts to obtain CACs where, *inter alia*, the extra personnel was not working under the particular EODT Contract that EODT added them to was confirmed by Officer Perez.

55. On January 25, 2011, Al Martin, J-9 Team Leader at EODT, ordered Plaintiff to move from the AL HUREA villa where Plaintiff had been temporarily living as an EODT employee because Mr. Imod Abdel Karim Arkawazi, the owner of AL HUREA, wanted Plaintiff fired for investigating the fuel theft and personnel misconduct matters and because Plaintiff refused to participate in and/or remain silent about the illegal activities.

56. On January 29, 2011, Plaintiff was moved again to the EODT Head Quarters on the VBC complex because his American Embassy badge was pulled in retaliation against Plaintiff for investigating EODT violations of the FCA as well as other misconduct including, without limitation, violations of national security, and for refusing to participate in and/or remaining silent about the illegal activities.

57. Over the next few days, Mr. Chris Meyer (Country Security Manager) and Mr. Paul Lane (EODT Country Manager) at EODT reassured Plaintiff that he would not be terminated and that Plaintiff should go "on leave" and enjoy.

58. On February 04, 2011, Plaintiff left Iraq "on leave."

59. Plaintiff is informed, believes, and based thereon alleges that in about the middle of February 2011, the EODT headquarters and FOB Shield locations were raided by several Federal Agencies.

60. On discovering that Plaintiff was further refusing to participate in the fraudulent misconduct by EODT and AL HUERA and that Plaintiff had reported Defendants' misconduct to the US Government, Defendant terminated Plaintiff from EODT on February 24, 2011.

## IV. SECOND CAUSE OF ACTION

### (Employment Retaliation Pursuant to 31 U.S.C. §3730(h))

61. Plaintiff re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 60 of this Complaint as if set forth here in full.

62. Pursuant to the FCA, an employee who is retaliated against by his or her employer because of lawful acts by the employee to further an action under 31 U.S.C. §3730 is entitled to all relief necessary to make the employee whole.

63. In relevant part, 31 U.S.C. §3730 provides that:

> (1) In general. Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter [31 USCS §§ 3721 et seq.].
>
> (2) Relief. Relief under paragraph (1) shall include reinstatement with the same seniority status that employee, contractor, or agent would have had but for the discrimination, **2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable**

> **attorneys' fees**. An action under this subsection may be brought in the appropriate district court of the United States for the relief provided in this subsection.

(Emphasis added.) (31 U.S.C. Section 3730(h).)

64. Congress added 31 U.S.C. § 3730(h) to the FCA in 1986 to protect "whistleblowers," those who come forward with evidence that their employer is defrauding the government, from retaliation by their employer. (S. Rep. No. 345, 99th Cong., 2d Sess. 34 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5299.)

65. As alleged more fully herein above, at all relevant times, Plaintiff was engaging in conduct protected under the FCA.

66. EODT and AL HUERA knew that Plaintiff was engaging in conduct protected by the FCA.

67. EODT and AL HUERA had actual knowledge that they were violating the FCA, conspired to violate the FCA, and/or acted in deliberate ignorance of the truth or falsity of their false or fraudulent claims, and/or acted in reckless disregard of the truth or falsity of their false or fraudulent claims in violation of the FCA.

68. EODT and AL HUERA retaliated and discriminated against Plaintiff because he was engaging in protected conduct under the FCA and refused to participate in and/or remain silent about their illegal activities.

69. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has lost income, employment, and career opportunities, and has suffered other economic loss in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

70. As a direct, foreseeable, and proximate result of Defendants' outrageous conduct as alleged herein, Plaintiff has suffered great anxiety, embarrassment, anger, loss of enjoyment of life, and severe emotional distress in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

71. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper

and evil motive amounting to malice. Alternatively, Defendants' despicable conduct was carried out in conscious disregard of Plaintiff's rights. Defendants' conduct was carried out by a managing agent, or an officer, a director, or a managing agent of Defendants, and Defendants had advance knowledge of the unfitness of its decision-maker and employed him or her with a conscious disregard of Plaintiff's rights and/or authorized and/or ratified his or her conduct. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages in an amount commensurate with each Defendant's wealth.

## V. THIRD CAUSE OF ACTION

**(Wrongful & Tortious Discharge in Violation of Public Policy)**

72. Plaintiff re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 71 of this Complaint as if set forth here in full.

73. The FCA (31 U.S.C. §§3729-3733) and Tennessee's Whistleblower Statute (T.C.A. 50-1-304) embody fundamental, substantial, and well-established public policies. In discharging Plaintiff, Defendant EODT violated the fundamental, substantial, and well-established public policies embodied in the FCA (31 U.S.C. §§3729-3733) and Tennessee's Whistleblower Statute (T.C.A. 50-1-304).

74. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has lost income, employment, and career opportunities, and has suffered other economic loss in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

75. As a direct, foreseeable, and proximate result of Defendants' outrageous conduct as alleged herein, Plaintiff has suffered great anxiety, embarrassment, anger, loss of enjoyment of life, and severe emotional distress in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

76. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice. Alternatively, Defendants' despicable conduct was carried out in conscious disregard of Plaintiff's rights. Defendants' conduct was carried out by a managing agent, or an officer, a director, or a managing agent of Defendants, and Defendants

- 13 -

had advance knowledge of the unfitness of its decision-maker and employed him or her with a conscious disregard of Plaintiff's rights and/or authorized and/or ratified his or her conduct. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages in an amount commensurate with each Defendant's wealth.

## VI. FOURTH CAUSE OF ACTION

**(Wrongful & Tortious Discharge in Violation of Tennessee Code §50-1-304)**

77. Plaintiff re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 76 of this Complaint as if set forth here in full.

78. Tennessee's Whistleblower Statute set forth in Tennessee Code Section 50-1-304 states, in relevant part, that:

> (a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities.
>
> \*\*\*\*
>
> (c) As used in this section, "illegal activities" means activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare.
>
> (d) (1) Any employee terminated in violation of subsection (a) shall have a cause of action against the employer for retaliatory discharge and any other damages to which the employee may be entitled.
>
> (2) Any employee terminated in violation of subsection (a) solely for refusing to participate in, or for refusing to remain silent about, illegal activities who prevails in a cause of action against an employer for retaliatory discharge for such actions shall be entitled to recover reasonable attorney fees and costs.

(Tenn. Code Ann. §50-1-304.)

79. As alleged more fully herein above, Plaintiff refused to participate in and/or refused to remain silent about Defendants' illegal activities.

80. Therefore, Defendant EODT fired Plaintiff in violation of Tennessee Code Section 50-1-304.

- 14 -
COMPLAINT OF WILLIAM C. HYSER FOR WRONGFUL TERMINATION
Case 3:11-cv-00185-RLJ-CCS   Document 1   Filed 04/22/11   Page 14 of 17   PageID #: 14

81. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has lost income, employment, and career opportunities, and has suffered other economic loss in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

82. As a direct, foreseeable, and proximate result of Defendants' outrageous conduct as alleged herein, Plaintiff has suffered great anxiety, embarrassment, anger, loss of enjoyment of life, and severe emotional distress in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

83. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice. Alternatively, Defendants' despicable conduct was carried out in conscious disregard of Plaintiff's rights. Defendants' conduct was carried out by a managing agent, or an officer, a director, or a managing agent of Defendants, and Defendants had advance knowledge of the unfitness of its decision-maker and employed him or her with a conscious disregard of Plaintiff's rights and/or authorized and/or ratified his or her conduct. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages in an amount commensurate with each Defendant's wealth.

## VII. FIFTH CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

84. Plaintiff re-alleges and incorporates herein each and every allegation in Paragraphs 1 through 83 of this Complaint as if set forth here in full.

85. The relationship between employer and employee is fundamentally contractual. Inherent in this contractual relationship is a covenant of good faith and fair dealing, which implies a promise that each party will refrain from doing anything to injure the other's right to receive the benefits of the agreement and which protects the parties' reasonable expectations. The provisions of the FCA and Tennessee Code are implied by law into all employment agreements, including the employment agreement entered into between Plaintiff and Defendant EODT. By discharging Plaintiff in violation of the FCA and Tennessee Code Section 50-1-304, Defendant EODT injured Plaintiff's right to receive the benefits of his

- 15 -

employment agreement and thwarted Plaintiff's reasonable expectations.

86. In so doing, Defendant EODT breached the implied covenant of good faith and fair dealing.

87. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has lost income, employment, and career opportunities, and has suffered other economic loss in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

88. As a direct, foreseeable, and proximate result of Defendants' outrageous conduct as alleged herein, Plaintiff has suffered great anxiety, embarrassment, anger, loss of enjoyment of life, and severe emotional distress in an amount that exceeds $50,000, the precise amount of which will be proved at trial.

89. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice. Alternatively, Defendants' despicable conduct was carried out in conscious disregard of Plaintiff's rights. Defendants' conduct was carried out by a managing agent, or an officer, a director, or a managing agent of Defendants, and Defendants had advance knowledge of the unfitness of its decision-maker and employed him or her with a conscious disregard of Plaintiff's rights and/or authorized and/or ratified his or her conduct. As a result of Defendants' conduct, Plaintiff is entitled to recover punitive damages in an amount commensurate with each Defendant's wealth.

## VIII. REQUEST FOR JURY TRIAL

Plaintiff requests a trial by jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, plaintiff requests relief as follows:

1. For back pay, front pay, and other special damages according to proof;
2. For general damages to compensate Plaintiff for emotional distress, pain and suffering, and loss of enjoyment of life;
3. For punitive damages;
4. For prejudgment interest on all damages awarded;

- 16 -

COMPLAINT OF WILLIAM C. HYSER FOR WRONGFUL TERMINATION

Case 3:11-cv-00185-RLJ-CCS   Document 1   Filed 04/22/11   Page 16 of 17   PageID #: 16

1    5. For reasonable attorney fees under FCA and Tennessee Code Section 50-1-304
2    and any other applicable statute or legal principle;
3    6. For costs of suit incurred; and
4    7. For such other and further relief as the Court may deem just and proper.

DATED: 04/14/11    By: _____
James A. Demarais, Esq.
A Professional Law Corporation
Attorney for **WILLIAM C. HYSER**